# EXHIBIT A

| | |
|---|---|
| 1st Judicial District Court<br>Jefferson County, State of Colorado<br>Court Address: 100 Jefferson County Pkwy.<br>Golden, CO 80419 | DATE FILED: May 21, 2018 8:00 AM<br>FILING ID: CEB1AB482ACC4<br>CASE NUMBER: 2018CV30819 |
| **Plaintiffs:** Garry Jackson and Josefina Jackson<br><br>v.<br><br>**Defendant:** Owners Insurance Company | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiffs:**<br>Attorney: Andrew M. Newcomb, #37032<br>Samuel F. Mitchell, #51253<br>Address: Speights and Worrich, LLC<br>2149 South Holly Street, Suite 105<br>Denver, CO 80222<br>Phone Num.: (303) 662-8082<br>FAX Num.: (303) 662-8083<br>E-Mail: andrew@speightsfirm.com<br>sam@speightsfirm.com | Case Number:<br><br>Div.: |
| **COMPLAINT AND JURY DEMAND** ||

COME NOW PLAINTIFFS, Garry Jackson and Josefina Jackson, by and through their attorneys, Speights and Worrich, LLC, and file this Complaint against the above-named Defendant as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Garry Jackson and Josefina Jackson ("Plaintiffs") are citizens of Jefferson County in the State of Colorado.

2. Upon information and belief, Defendant, Owners Insurance Company ("Owners" or "Defendant") is a foreign corporation organized under the laws of Michigan, with its principal place of business located at 6101 Anacapri Blvd., Lansing, Michigan 48917, and is authorized to do business in Colorado. Defendant may be served with process upon its registered agent, the Division of Insurance, at 1560 Broadway, Denver, Colorado 80202.

3. This Court has jurisdiction over the subject matter of this action and the parties hereto.

4. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(1).

1

## GENERAL ALLEGATIONS

5. Defendant issued Policy Number 4782949800 (hereinafter the "Policy") to Plaintiffs insuring property located at 28151 Bonanza Drive, Evergreen, Colorado 80439 (hereinafter the "Property") on the date of the insurance loss at issue.

6. The Policy is a homeowner's policy that covers, *inter alia*, all risks of direct physical loss or damage to the home located at the Property, including property damaged by lightning, fire and smoke. Plaintiffs' coverages included Coverage "A"- Dwelling, Coverage "B"- Other Structures, Coverage "C"- Personal Property and Coverage "D"- Additional Living Expenses.

7. On or about August 31, 2015, lightning struck the Plaintiffs' Property ("Lightning Event"), causing severe and complex damage to the primary residence structure, secondary structures, and personal property. The secondary structure consisted of an island within the circular driveway on the Property, and included a fully electrified gazebo, lighting system, and other landscape features that suffered heavy damage from the Lightning Event.

8. On or about August 31, 2015, Plaintiffs filed a claim for benefits with Defendant and Defendant issued claim number 300-0066897-2015 related to the Lightning Event. The damage to Plaintiffs' home was so significant that they were required to vacate the home.

9. On or about September 1, 2015, agents of Defendant met with Plaintiff Garry Jackson ("Mr. Jackson") at the Property to perform an inspection of the damages. Defendant's insurance adjuster, Jayme Larson, was present at this meeting along with her supervisor, Devon Hannon. Due to the severity and extent of damage to the Property, at the inspection, Mr. Jackson requested that Ms. Larson provide him with a specific claims-handling procedure to follow so that he could reasonably expedite the adjustment and payment of his claim for all relevant coverages. Defendant did not provide him any such document either at the time of or immediately after this request.

10. On September 1, 2015, at Mr. Jackson's separate request, Defendant sent Mr. Jackson an email suggesting a disaster mitigation company to determine damage to the Property structures and his personal property. Defendant also informed Mr. Jackson that she retained a structural engineer, Mark Burns, to evaluate the damage to the Property on September 4, 2015.

11. On September 2, 2015, Defendant responded to Mr. Jackson's e-mail requesting his Additional Living Expense ("ALE") of $100/day, and approving this arrangement. Defendant further advised him of inspections with a cause and origin investigator, as well as the structural engineer. Mr. Jackson, on September 2, submitted an invoice for ALE in the amount of $2,399.60. Despite being pre-approved for the daily amount, Defendant did not issue payment on Plaintiffs' ALE invoice until November 25, 2015, eighty-four (84) days after the initial request, and was $900.00 less than his invoice.

12. Plaintiffs retained a property mitigation contractor, Pete Castillo of Property Assurance ("Castillo"), on or about September 5, 2015. On September 8, 2015, Mr. Castillo, emailed Ms. Larson to give her a summary identification of work to be performed and to request Mr. Burns' report in order to obtain information regarding the extent of damage to the Property. Mr. Castillo also requested guidance on how to submit bids/invoices for the various trades required to repair Plaintiffs' Property (**Exhibit A**). Upon information and belief, Ms. Larson did not respond to this email.

13. On September 9, 2015, Mr. Jackson sent Ms. Larson an email again requesting clarification on the same process for submitting contractor bids for work to be performed on the structure, as well as for submission of invoices for personal property/ALE (**Exhibit B**). In his email, Mr. Jackson reiterated his request for:

> "the procedure of submitting our expenses making it easier on your end (weekly entries supported by receipts on weekly basis or on an on going [sic] basis with weekly sub totals… I prefer weekly, or on the outside, monthly. Secondly, we need to get the agreed upon advance payment for lodging to our daughter (my notes say we agree on a quarterly advance based on $100.00 per day). Thanking you in advance for your attention to this matter… Just an FYI… today Pete at Property Assurance is to start outside clean-up of debris scattered all over property to include roof tops of home and swing shelters… also, I need a copy of his bid… Look forward to talking with you… I know you're very busy and we thank you for your help!"

14. On September 10, 2015, Defendant issued a check in the amount of $15,000.00, along with a "Property Advance Payment" which specifically indicated that the payment was not to be applied to "dwelling/building" payments (**Exhibit C**). The check memo indicated "Advanced payment for $15,000.00 under personal property coverage" and did not include any payment for property mitigation or construction, despite both Plaintiffs and Plaintiffs' contractor providing information to Defendant regarding the extent of damage to the Property and the necessity for the same.

15. On September 17, 2015, Mr. Castillo again emailed Ms. Larson to advise that he encountered asbestos in the Property and asked her to identify Defendant's procedure, if any, in handling asbestos mitigation/abatement issues, and identifying the vast scope of damage to the main floor, including removal of "drywall throughout the main floor in order to check the electircle [sic] wiring and walls will have to be removed in order to remove the charred subfloor, floor joist, and structural joist in the crawlspace" (**Exhibit D**). Plaintiffs had incurred approximately $20,000.00 in costs to Property Assurance at this time.

16. On September 17, 2015, Mr. Jackson emailed Ms. Larson again requesting a copy of the causation report, the structural engineering report, and information on how to pay Mr. Castillo for his work (**Exhibit E**). Upon information and belief, Ms. Larson finally replied to this email and included the engineering report on September 21, 2015.

3

17. On September 21, 2015, Mr. Jackson emailed Ms. Larson and advised her that no work had been initiated on the Property since the incident (**Exhibit F**). Mr. Jackson noted that Mr. Castillo was unable to bid the job or retain subcontractors without direction from Defendant as he requested on September 8 and 17, 2015. Mr. Jackson asked if he should alternatively obtain bids from contractors to begin work and again asked for Defendant's guidance.

18. Nine (9) days later, on September 30, 2015, Ms. Larson sent an email to Mr. Jackson suggesting a meeting to address "all of these emails," referring to Mr. Jackson's prior requests for direction on his claim. The meeting was scheduled for October 2, 2015, and occurred at the Property.

19. In response to the meeting, on October 21, 2015, Defendant sent payment for the actual cash value ("ACV") dwelling/building coverage in the amount of $27,831.96. The payment did not include any breakdown of specific items to be paid from the total. Mr. Jackson contacted Ms. Larson upon receipt of this check and asked if Defendant would be identifying what specific invoices or trades to which this payment would apply. Ms. Larson advised that Mr. Jackson was free to use the money in whatever manner he chose, despite the indication on the draft and document.

20. As of October 21, 2015, Plaintiffs had already paid approximately $12,000.00 to various contractors, primarily for the performance of landscaping work on secondary structure, the gazebo and island attached to the Property, and had advised Defendant of the same. This was in addition to the $20,000.00 of remediation and removal work performed by Property Assurance that Plaintiffs had submitted to Defendant but remained unpaid.

21. Separate and apart from the aforementioned unreasonable delay, parallel delay was occurring between Plaintiffs and Defendant. In approximately November 2015, Plaintiffs retained a general contractor, Jack Kennedy of Kennedy Custom Designs (hereinafter "Kennedy") to advise and oversee the Property structural re-construction, and authorized Kennedy to communicate directly with Defendant in the hope that the involvement of a general contractor would streamline the process.

22. In the process of retaining Kennedy, Plaintiffs learned that Defendant should have performed an estimate of the damages to the Property upon receipt of Plaintiffs' claim, commonly known as an "adjuster's report" or Xactimate estimate. Plaintiffs had not received such a report at any time prior to learning of its existence from Kennedy.

23. On November 4, 2015, Mr. Jackson emailed Defendant and this time specifically requested a copy of Defendant's "adjuster's report" or Xactimate estimate to initiate work on the Property "as quickly as possible." In November 2015, Mr. Jackson, Kennedy and agents for the Defendant held an in-person meeting to identify the scope of repairs on the Property.

24. On November 13, 2015, Ms. Larson responded to Plaintiffs wherein she provided a supplemental estimate of the Property to include "proper pricing of the tile and bid items

4

for the winterization, roofing and temporary electrical." The amount of this estimate was $37,302.58. Ms. Lawson finished the email by stating that she would "be out of town all of next week." It was not until December 2, 2015, and well after the one week "out –of-office" message that Ms. Larson responded to Plaintiffs' requests for payment and direction on invoices.

25. Mr. Jackson requested that he receive updates on payments made to Kennedy upon his submission of invoices for payment to Defendant to assist with his record-keeping. Rather than assist and advise its insured, Defendant on November 15, 2015, informed Plaintiffs that "you will not be able to see payments we issued that are in direct correlation with Jack [Kennedy]'s invoices or his accounting." The basis for Defendant's statement was not explained to Plaintiffs, despite their specific concerns about the previous mismanagement of payments made on the claim and caused additional delay and confusion to Plaintiffs.

26. Mr. Jackson responded to Ms. Larson's December 2, 2015 email on the same day, wherein he indicated that the Defendant's payment was $321.05 above the amounts due and owing. Plaintiffs also requested payment on the agreed upon amounts due and owing from the in-person meeting with agents for Defendant and Kennedy.

27. On December 4, 2015, Plaintiff emailed Ms. Larson seeking clarification as to why his September 2015 ALE reimbursement invoices remained unpaid and for greater clarification as to why his claim was not receiving proper attention and payment.

28. On December 7, 2015, Ms. Larson responded to Plaintiffs and indicated that payment for the September 2015 ALE would be forthcoming. The Defendant's response did not contain any specific explanation addressing the delay of 90+ days in issuing payment.

29. In an effort to expedite the process and alleviate further miscommunication and delays, Mr. Jackson e-mailed Defendant on February 1, 2016, to request a 90-minute in-person meeting between all relevant parties to clarify any differences of opinion and develop a working plan.

30. Defendant responded with a "thank you" and declined the meeting, indicating that if it deemed such a meeting necessary after reviewing documentation (already in Defendant's possession), it would contact Plaintiffs. This created additional delay in the claim.

31. Between November 15, 2015 and June 2017, Kennedy performed work at the Property and Defendant issued payment to Kennedy for invoices submitted by him. Defendant's payments did not include specific identification for payment of the various trades and materials retained by Kennedy, and created substantial confusion for Plaintiffs. As of June 2017, Kennedy had received $187,076.94 from Defendant for work performed, but claimed an outstanding amount of $20,338.00 due from Plaintiffs. Because Defendant would not provide specific accounting of its payments to Kennedy, Plaintiffs were unable to substantiate the validity of payments for the various trades and work performed.

32. Plaintiffs continued to communicate with Defendant to try and determine a specific itemization of payments made prior and subsequent to Kennedy's involvement as the general contractor. Kennedy submitted a total of five (5) invoices to Defendant. Defendant made payment of four (4) of these invoices directly to Kennedy, without providing any itemization or accounting to Plaintiffs.

33. In the interim, Kennedy demanded payment of his final invoice, dated approximately February 13, 2017, in the amount of $20,338.00. Because Defendant failed to provide an itemization or accounting to Plaintiffs, they were unable to determine whether the amount claimed by Kennedy was accurate. Defendant did not pay Kennedy's final invoice, and has not yet paid the same.

34. As a direct and proximate cause of Defendant's unreasonable conduct, Kennedy filed a Notice of Intent to Lien Plaintiffs' Property. Kennedy walked off of the job site on or about November 15, 2016, leaving it unfinished.

35. Kennedy subsequently filed a lawsuit against Plaintiffs in the amount of $25,258.00 for Plaintiffs' alleged failure to pay the outstanding invoice. But for Defendant's unreasonable claim handling conduct and failure to clearly communicate, Plaintiffs would not have been subjected to such litigation. As such, Plaintiffs were required to obtain legal counsel to defend against this otherwise avoidable lawsuit. The litigation was ultimately settled for approximately $17,500.00 with indemnification from Defendant. As a result, Plaintiffs assert the settlement amount with Kennedy as damages in the instant litigation.

36. As a consequence of Defendant's unreasonable conduct including but not limited to delaying payments, failure to timely provide material information regarding the claim, failure to reasonably and appropriately provide an accounting of periodic payments with specific coverages under the Policy, refusal to release Plaintiffs' depreciation, and delaying/denying payment of amounts due and owing under the Policy, Plaintiffs have incurred and continue to incur damages.

### FIRST CAUSE OF ACTION
(Breach of Contract)

37. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

38. The Policy creates a contract of insurance.

39. By its actions, as described above, Defendant breached the contract of insurance.

40. As a direct and proximate result of said breach, the Plaintiffs are entitled to damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Bad Faith Breach of Insurance Contract)

41. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

42. Defendant owed duties to Plaintiffs under the Policy's implied covenant of good faith and fair dealing, wherein it covenanted that it would, in good faith, and in the exercise of fair dealing, deal with Plaintiffs fairly and honestly, faithfully perform its duties of representation, and do nothing to impair, interfere with, hinder, or potentially injure Plaintiffs' rights to receive the Policy's benefits.

43. Defendant acted unreasonably and breached its duties of good faith and fair dealing by its actions, which included, without limitation, the following unreasonable acts:

    a. Failing to properly investigate and evaluate Plaintiffs' claims for Policy benefits;
    b. Failing to pay Plaintiffs the full benefits owed under the Policy;
    c. Failing to pay amounts under the Policy in a timely manner;
    d. Failing to effectuate a prompt, fair, and equitable settlement of Plaintiffs' claims;
    e. Failure to give equal consideration to Plaintiffs' rights and interests as it has given its own interests;
    f. Depriving Plaintiffs of the benefits and protections of the contract of insurance;
    g. Compelling Plaintiffs to institute litigation in order to recover amounts due under the Policy; and
    h. Other conduct to be revealed through discovery.

## THIRD CLAIM FOR RELIEF
### (Violation of C.R.S. §10-3-1115 and Relief Pursuant to §10-3-1116)

44. Plaintiffs incorporate the foregoing paragraphs of their Complaint as if fully set forth herein.

45. C.R.S. §10-3-1115 forbids an insurer from unreasonably delaying or denying payment of a claim for benefits owed to or on behalf of a first-party claimant.

46. Plaintiffs are first-party claimants under C.R.S. §10-3-1115.

47. Defendant has delayed and denied resolution of Plaintiffs' claim without a reasonable basis within the meaning of C.R.S. §10-3-1115.

48. C.R.S. §10-3-1116 provides that a first-party claimant whose claim has been unreasonably delayed or denied by an insurer may bring an action in Colorado district court to recover reasonable attorneys' fees and court costs and two times the covered benefit.

49. Because Defendant's actions, as described above, violate C.R.S. §10-3-1115, Plaintiffs bring this claim to recover their reasonable attorneys' fees and court costs and two times the covered benefit, as allowed under C.R.S. §10-3-1116.

WHEREFORE, Plaintiffs Garry Jackson and Josefina Jackson respectfully request that judgment be entered in their favor and against Defendant Owners Insurance Company as follows:

a. For compensatory damages, both economic and non-economic, in amounts to be proved at trial;
b. For double damages pursuant to statute;
c. For all prejudgment interest, statutory or moratory, and post-judgment interest allowed by law;
d. For reasonable attorneys' fees and costs of suit herein; and
e. For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated this 21st day of May, 2018.

Respectfully Submitted,

SPEIGHTS & WORRICH LLC

By: */s/ Andrew M. Newcomb*
Andrew M. Newcomb, #37032
Samuel Mitchell, #51253

In accordance with C.R.C.P. 121, §1-26(9), a printed copy of this document with original signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.

From: **Peter Castillo** peter@propertyassuranceco.com
Subject: Garry Jackson Claim
Date: September 8, 2015 at 4:28 PM
To: larson.jayme@aoins.com
Cc: garry jackson togjackson@gmail.com

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CEB1AB482ACC4
CASE NUMBER: 2018CV30819

Hello Jayme,

I'm communicating in regards to Garry Jackson and his claim at 28151 Bonanza Dr, Evergreen. We met there last Friday.

I am with Property Assurance and Mr. Jackson has hire my group to manage this repair.

Mr. Jackson has informed me the structural engineer was at his home Friday afternoon till nearly 430 pm. I would guess it may take him a few days to write his report.

Would you provide the SE's contact information, so I can communicate with him directly regarding any structural concerns?

As I see it, once we have the structural report, we can have a framing crew shore up the property per that report. Once that is complete, we can start to have various contractors in to do their work.

Immediate needs would be temporary electrical box from Xcel for contractor needs. Then I would see electrical and plumbing contractors in to test systems and determine extent of damage and repair needs.

Cleaning can start fairly soon as well. I have someone out tomorrow to begin clearing debris from the driveway, etc.

For each trade, will you be expecting to see several bids? Or would you expect me to vet the trades to determine best price and best value? I'm happy to do so. With proper documentation of course.

Otherwise, how would you like for yourself, Mr. Jackson and I to communicate? What I hope to create is a system that will respond as quickly as possible and allow this project to move as quickly as possible as well.

Any insight you can provide will be greatly appreciated.

Thanks
Pete

Peter Castillo



**PropertyAssurance**
RESTORATION·REPAIR

**EXHIBIT A**

**From:** Garry Jackson togjackson@gmail.com
**Subject:** Expenses
**Date:** Sep 9, 2015, 9:39:38 AM
**To:** larson.jayme@aoins.com

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CEB1AB482ACC4
CASE NUMBER: 2018CV30819

Jayme.... Please call me at 303-591-3663...I just want to be clear on the procedure of submitting our expenses making it easier on your end (weekly entries supported by receipts on weekly basis or on an going basis with weekly sub totals...I prefer weekly, or on the outside, monthly. Secondly, we need to get the agreed upon advance payment for lodging to our daughter ( my notes say we agree on a quarterly advance based on $100.00 per day).
Thanking you in advance for your attention to this matter....
Just an FYI... Today, Pete at Property Assurance is to start outside clean-up of debris scattered all over property to include roof tops of home and swing shelters...also, I need a copy of his bid...Look forward to talking with you...I know you're very busy and we thank you for your help!...Garry Jackson

Sent from my iPhone

Exhibit B

**CLAIM PAYMENT**     354740144

BROOMFIELD CLAIMS
PO BOX 6490
BROOMFIELD CO 80021

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CF31AB482ACC1
CASE NUMBER: 2018CV30819

*Auto-Owners Insurance*
Life Home Car Business
*The 'No Problem' People*

| CLAIM NUMBER | PAID DATE | AMOUNT PAID |
|---|---|---|
| 300-0066897-2015 | 09/10/2015 | $***15,000.00 |
| LOSS DATE | STATUS | POLICY NUMBER |
| 08/31/2015 | OPEN COVERAGE | 47 829498 00 |
| INSURED | | |
| GARRY JACKSON | | |

DODRILL INSURANCE INC
PO BOX 27299
DENVER CO 80227-0299

GARRY JACKSON
28151 BONANZA DR
EVERGREEN, CO 80439-6303

| Coverage | Pay_Type | Amount |
|---|---|---|
| Cov C: Personal Property (001; 28151 BONANZA DR) | Actual Cash Value | $15,000.00 |

\*\*\* Additional payment details available upon request. \*\*\*

DETACH HERE AND KEEP FOR YOUR RECORDS

OWNERS INSURANCE CO. - CLAIM PAYMENT CHECK     354740144

BANK OF AMERICA, NA
CHICAGO IL 60610

70-2328
719 IL

09/10/2015

FIFTEEN THOUSAND AND 00/100 DOLLARS

PAY TO THE
ORDER OF GARRY JACKSON & JOSEFINA JACKSON

| INSURED: GARRY JACKSON | |
|---|---|
| CLAIM NUMBER | LOSS DATE |
| 300-0066897-2015 | 08/31/2015 |
| POLICY NUMBER | AGENCY |
| 47 829498 00 | 32-0090-00 |

$***15,000.00

IN PAYMENT OF:
Advanced payment for $15,000.00 under personal property coverage

⑆035474014⑆ ⑈071923284⑈ 876581814⑈

Exhibit C

## PROPERTY ADVANCE PAYMENT/NON-WAIVER AGREEMENT

☐ AUTO-OWNERS INSURANCE COMPANY
☑ HOME-OWNERS INSURANCE COMPANY
☐ OWNERS INSURANCE COMPANY
☐ PROPERTY-OWNERS INSURANCE COMPANY
☐ SOUTHERN-OWNERS INSURANCE COMPANY

*Auto-Owners Insurance*
Life Home Car Business

NAMED INSURED: Garry & Josefina Jackson     POLICY NUMBER: 47-829498-00

DATE OF LOSS: August 31, 2015     CLAIM NUMBER: 300-0066897-2015

This agreement acknowledges you have sustained a __Lightning_____
                                                                    (type)
loss on __August 31, 2015_____.
              (date)

As your insurer, we recognize the loss may have created an economic hardship for you and agree to advance partial benefits, which may be available to you, as a form of temporary relief. The advance of $ _15,000.00_____ is to be accounted for at a later date and will be deducted from your final proven loss for ☑Personal Property, ☐Dwelling/Building,

☐ Other_____

It is understood our investigation is not complete and it may be later established that there is no legal obligation for payment under your policy. Issuance of advance payments by the company is not an admission of liability. Acceptance by you does not represent a satisfaction or release of all claims. It is understood this advance shall not benefit any third parties in any manner whatsoever.

This is not a PROOF OF LOSS as required by the policy. A PROOF OF LOSS must still be submitted to the company within 60 days of the date of loss stated above.

This agreement or payment of the advance is not intended to change or modify any of the conditions, terms, provisions or requirements contained in the policy. Any obligations or legal rights which may now or hereafter be available to you or the company are reserved.

by _____     RECEIVED _____
    Company Representative                      Insured

DATE _9-10-15_____                       _____
                                                        Spouse

18033 (2-15)     Page 1 of 2     Exhibit C

ALABAMA STATUTES PROVIDE THAT "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution, fines, or confinement in prison, or any combination thereof."

ARIZONA STATUTES PROVIDE THAT "For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties."

ARKANSAS STATUTES PROVIDE THAT "Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison."

COLORADO STATUTES PROVIDE THAT "It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies."

FLORIDA STATUTES PROVIDE THAT "Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree."

IDAHO STATUTES PROVIDE THAT "Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony."

INDIANA STATE STATUES PROVIDE THAT "A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony."

KENTUCKY STATUTES PROVIDE THAT "Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime."

MINNESOTA STATUTES PROVIDE THAT "A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime."

OHIO STATUTES PROVIDE THAT "Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud."

PENNSYLVANIA STATUTES PROVIDE THAT "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties" and "Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and payment of a fine of up to $15,000."

TENNESSEE STATUTES PROVIDE THAT "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."

VIRGINIA STATUTES PROVIDE THAT "It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits."

**From:** Peter Castillo peter@propertyassuranceco.com
**Subject:** jackson fire project
**Date:** September 17, 2015 at 2:58 PM
**To:** larson.jayme@aoins.com
**Cc:** garry jackson togjackson@gmail.com

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CEB1AB482ACC4
CASE NUMBER: 2018CV30819

Hello Jayme,

We have had the first few trades in to pull together repair costs. This includes an industrial hygenist to test for asbestos in the main floor area. Asbestos containing materials have been found in the majority of the main floor. This is a key issue as we'll be removing drywall throughout the main floor in order to check the electircle wiring and walls will have to be removed in order to remove the charred subfloor, floor joist and structural joist in the crawlspace.

In work I've done for Auto Owners, I've never run into an abatement issue. Are there any elements regarding this process that Auto Owners may have uniquely? Your input is greatly appreciated.

Thanks,

Peter Castillo
Property Assurance
303-888-6113

**Exhibit D**

From: Garry Jackson togjackson@gmail.com
Subject: Re: 300-0066897-2015 - GARRY JACKSON
Date: Sep 17, 2015, 2:22:53 PM
To: Larson, Jayme Larson.Jayme@aoins.com

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CEB1AB482ACC4
CASE NUMBER: 2018CV30819

Jayme... FYI... I have never received lightening report or the structural engineer's report... Also I've not received any info on what Pete Costillo is charging for his services, have you?... Thanks, Garry
Ps.... Just heard from Billy Huff the asbestos guy and the walls in question are "hot", so abatement effort begins with Pete making contacts... Will delay carpentry work 10-15 days...
Sent from my iPhone

On Sep 2, 2015, at 11:17 AM, Garry Jackson <togjackson@gmail.com> wrote:

Sent from my iPhone

On Sep 1, 2015, at 12:50 PM, "Larson, Jayme" <Larson.Jayme@aoins.com> wrote:

Hi Garry,

I got the answer for the additional living expense. If you choose to stay with your daughter, we could compensate her for the expense. You had mentioned $100.00 a night. Do you think this is fair? I do but you are more familiar with the area and such. Please keep receipts for food etc. because that is all covered

**Exhibit E**

as well.

The cause and origin engineer is ok for Friday between 9:30AM and 10:00AM. I also have initiated a structural engineer. His name is Mark Burns. He is going to be contacting you because he could not be there that early, but will be able to a bit after that. He is with Ponderosa Associates in case you have/get a missed call.

Hang in there and I will see you Friday. Please contact me with any questions or concerns.

Thanks,

*Jayme Larson*
Auto-Owners Insurance
Field Claims Representative
Phone: (303) 262-1015 ext. 3735
Fax: (303) 262-1017
broomfield.clm@aoins.com

**Exhibit E**

From: **garry jackson** togjackson@gmail.com
Subject: What to do
Date: September 21, 2015 at 12:23 PM
To: larson.jayme@aoins.com

DATE FILED: May 21, 2018 8:00 AM
FILING ID: CEB1AB482ACC4
CASE NUMBER: 2018CV30819

Jayme... We are at day 22 and not a thing has been done or begun... Still no info on Pete Costillo regarding what he is charging for his services... And is he paid for work not done ie we are on our third electrician over these 3 weeks with zero accomplished .....no work on island trenching, wiring to and from used lights to house, steps, walk ways, flag pole patio etc...can I get bids myself for window cleaning, chimney sweep, lower deck restoration, gutter work and things that have nothing with the inside of the house...I think we could have most if not all outside work done in 2-weeks....and how many bids do you want for each task ... Thanks look forward to reading your advice....
Garry


Sent from my iPhone

Exhibit F